is in the last case today. We're glad to have you here today and you may proceed. Thank you, your honors. Good afternoon. May it please this honorable court. My name is Alfred Guillaume. I'm a counsel for appellant Maximo Gondres-Medrano. Your honors, in this case, the district court erred when it determined that the search of Mr. Gondres-Medrano's shoebox was lawful. Also at trial, the district court has used this expression by emitting a video self-reported by Mr. Gondres-Medrano, which confused the members of the jury. Lastly, the district court improperly imposed an obstruction of justice enhancement at sentencing. Your honors, beginning first with the motion to suppress, it is our position that an uncorroborated informant's tip received by the police in this case that Mr. Gondres-Medrano was going to be involved in a drug deal on a specific date did not establish probable cause to search a shoebox he was carrying on that date. The search of the shoebox was also not supported by any other exception to the warrant requirement of the Fourth Amendment. In particular, the search is sent to arrest exception or the automobile exception. Your honors, this case involves Mr. Gondres-Medrano who police began investigating in the summer of 2017, approximately two to three months prior to searching his shoebox. The initial tip by the informant was that Mr. Gondres-Medrano was a drug dealer transporting drugs between New York and Baltimore. The lead detective on the case had never before arrested Mr. Gondres-Medrano. He never had seen him before. He never heard his voice before. And the lead investigator, Mr. Gondres-Medrano is of Dominican descent. The lead investigator does not speak or understand Spanish. From the initial investigation, which began around July 2017, the police ended up obtaining a tracking warrant for Mr. Gondres-Medrano's vehicle. That tracking warrant for the tracking device under the vehicle yielded no information, did not corrupt, in other words, did not corroborate the informant's tip that Mr. Gondres-Medrano was in fact a drug dealer moving. Counsel, what was the tracking warrant based on? What was the probable cause for the tracking warrant? Wasn't it the informant's statements? Yes, your honor. The probable cause was a couple of things. One, that Mr. Gondres-Medrano was in transporting drugs and that the informant had worked with him before. And also, your honor, that I believe a phone call had issued in the case where the informant was present, the detective was present, and a translator from the FBI, or excuse me, I can't remember the agency, but a translator was present there as well. And the basis of that call, the conversation, was allegedly about narcotics. But again, I would just remind the court that not even disputing that the call may have been about narcotics is that the person's voice on the other end of that phone was unknown to the officers at the time. So we would submit that it may have been enough for the tracking warrant, but it still does not establish probable cause for the eventual search of Mr. Gondres-Medrano. Counsel, to follow up on that, at the time, didn't, if it was enough for the tracking warrant, didn't the warrant reveal information about the location that was consistent with what was heard from the informant? Your honor, I don't know if I understand the question, but the location of the search, you're referring to the eventual search? No, I mean, didn't it indicate the location of the home from which the search was going to, or from which your client was going to leave? Your honor, the warrant was able to confirm that Mr. Gondres-Medrano lived in the particular home that has been alleged here. But the investigation was going on prior to the actual concrete tip that the informant gave the officers. So Mr. Gondres-Medrano, in fact, during the motions hearing or trial, the officer said that the only thing that was able to be confirmed at the time, that's my way of putting it, the only thing that was able to be confirmed was that fact that he did live at that address. But there was no other indication that anything illegal was happening at that address, any sort of drug activity. Your honor, at this point, the court to the Wilhelm case in which this court did not uphold the search of a home where the informant told the police that she had personally observed drugs in the home and drugs being sold from the home. And just to piggyback on what I just said a moment ago, Mr. Gondres-Medrano's residence was confirmed, but never any kind of illegal activity attributed to that residence. In this case, your honor, the three months leading up to his eventual search of his personal property yielded no confirmation of that initial informant's tip. I point the point to the cases of Blackwood and Miller. In both those cases, there was something that corroborated the informant's information. In Blackwood, there was a control by the officers were standing right outside. The information received in both cases was similar to this case, that this person is a suspected drug dealer. And in Blackwood, the informant actually purchased drugs and then the officer obtained a warrant to search. In Miller, the officer had actually previously arrested the defendant recently and also received the tip that the defendant in that the officer arrived to the location, saw the person, knew them, and also the objects that they were carrying gave some sort of indicia of potential packaging of drugs. We don't have that in this case, your honors. Mr. Medrano does have a prior criminal conviction, as the government has noted in its brief. However, the conviction occurred from at the time of the case. It was a 2010 conviction, so that was seven years old. And the case originated from 2005 out of New Jersey. So the officer was not involved and did not have any particular knowledge about that specific case. The government's also argued that exceptions apply to the search of Mr. Gondez Medrano's shoebox. In particular, the search incident to arrest exception. It's undisputed that the arrest of Under Gantt, the search of Mr. Gondez Medrano's box, you know, must be relevant to the crime of his arrest, which is an immigration offense. So there's nothing to suggest that they should, under Gantt, they should search Mr. Gondez Medrano's shoebox. In fact, he's actually handcuffed, not near the car. He's not within reaching distance of the car and it's not reasonable for an officer in that situation to believe that that there's evidence of an immigration offense. And that kind of segues into the automobile exceptions, your honor, your honors, is that Mr. Gondez Medrano, when he's arrested, handcuffed. There's no contraband in plain view in the car. He doesn't attempt to hide anything. He doesn't attempt to run. He doesn't attempt to destroy evidence. There's no, in other words, there's no probable cause that exists that develops during the stop in this case. Now, the government has cited a number of Supreme Court cases, and I believe a few Fourth Circuit cases as well, where the automobile exception was applicable because, but in every case that they cite, there was certain factors that caused probable cause to develop during the stop. We don't have that here. We just simply have an informant telling the police that he believes that without anything, any further information, there's a, he's going to be pranking drugs that day. My client's going to be putting drugs that day. And your honor, your honors, this court has stated, and I'm not sure if I'm pronouncing the name correctly, but the Pataikou case, the P-A-I-T-U-T-K-A case, that even if an officer has, with respect to the automobile exception, has reasonable suspicion to believe that there's potentially contraband in a vehicle, that's not enough, that you need more than that. And that's exactly what we have here, your honor. Even if it was, the officers believed it, the fact of the matter is they did not have enough probable cause nor any exceptions to search Mr. Madrono's shoebox. Your honors, if I could pivot to the abuse of discretion argument with respect to the video that was admitted at trial, we would argue that the district court did abuse its discretion by admitting the video because of the potential for a juror confusion in this case. In the video, Mr. Madrono is shown opening up what the government argues, and my client later was that, in fact, the government, in its opening argument, argued that the drugs in the shoebox, the drugs in the envelope, were the same drugs as the drugs that were eventually recovered. And we argue that that places our client, first of all, it's not really relevant, but it places our client in a difficult position. My client ultimately did testify. He gave an explanation for his actions in that case in which he actually did not any criminal behavior. But the fact that a jury hears that and then hears the government saying that these are the same drugs when he gave a very detailed accounting of what was in those, in that envelope and where he came from, et cetera, what he did with it afterwards, it's very different from what ended up being the theory for our case in this particular item that he actually stored drugs for a friend in his apartment. And to just add to that argument, Your Honor, is that with respect to that video admission, I did request that it be excluded prior to trial. I was denied. I asked for a curative instruction. The judge agreed at the time. And I, Your Honor, must admit that I did not ask again at the appropriate time for that as a result of the video. Even under a plain error analysis, looking at the Mitchell case, the factors in the Mitchell case that this court has laid out still is instructive as to why it requires reversal. The admission of that video requires reversal. And, Your Honor, if I could pivot last to the last argument that I have with respect to the sentencing enhancement that my client received, I will agree at the outset with the government's position that it was only, I guess the term used is substantively reasonable, it was only one more month added to the mandatory minimum sentence. In fact, to my client, however, I would argue that the district court's analysis of the perjury that was allegedly committed by Mr. Maldonado was in fact incorrect, focusing primarily on two factors, which were the contents of the envelope, which were not, again, which may or may not have been the drugs in this particular case, but our position was not, and whether he intended to show the video to police. I think that second argument overlooks the obvious that Mr. Maldonado showed the video to the police voluntarily, albeit that his timing was not in line with what the government's theory was. But that, even assuming that that's true, that he didn't intend to show it, we don't concede that, it's not material. Both things that I just mentioned are not material. Material matters. Well, isn't your best argument on that enhancement probably that the judge didn't make a finding of willfulness? Isn't that your best argument? I think additionally, your honor, I think it's a strong argument on both fronts, but it wasn't willful, things weren't material, and I would point this court to the Perez case, as I cited in my brief, which the court found that the defendant in that case did not, was incredible, but nonetheless, wasn't for material matter. I see my time is expiring, I would like to reserve some time. Yes, you have some time in rebuttal. Mr. Hahn? May it please the court, your honors, my name is Jeffrey Hahn, I represent the United States in this case. The center point of this case was possession with intent to distribute this drugs inside this silver case. Counsel, if you could speak up a little bit, I'm having a little trouble hearing you, maybe get a little closer and speak up, that'd be great. Sure, perhaps I'll take my headphones off, that might. That's better there. Can you hear me better at this point? I think so. All right. Your honors, the center point of this case was the silver gray shoe box, which had a duct tape wrapped package of heroin mixed with fentanyl inside of it. Central question from the beginning of the trial, through suppression arguments, and the trial itself, and then ultimately sentencing, was who knew what was in that box, and how did we know that they knew it? How did the officers build probable cause to know that there was drug evidence in that box when they seized it? And then once they seized it and found that it contained drugs, what evidence is there to show that the defendant knew the nature of those drugs and intended to distribute them? That's what all the arguments here come back to. Turning first to the probable cause and the suppression issue, there was multiple axes of probable cause here. Obviously, there was probable cause to stop the defendant based on this immigration order, but separate from that, there was probable cause related to drug trafficking. This was not an anonymous tip. They had probable cause to believe that this day there was going to be drugs transported and that they were going to be inside that car, ultimately, based on their observations. They had probable cause to believe the car contained evidence of a crime or contraband to search it under the Carroll Doctrine. And because of what they observed, they had probable cause to believe the defendant was engaged in drug trafficking, that he was possessing drugs with the intent to distribute. And so they had probable cause to arrest him, to search him incidentally to arrest, and ultimately to search a wingspan breach into that car. So there's two different bases for probable cause. Both of those stem from this source. This is not an anonymous tip. This is not an uncorroborated tip, but rather it was information that Officer Williams got from a person he knows, an informant that he worked with over several months in 2017, that he testified that he had successfully gotten information from that led to successful arrests. So Williams is a reliable person. And he directly spoke to it as distinguished from the Wilhelm case, where the officers there never got to speak to that tipster, and they never have any information about how the tipster had their information. Officer Williams directly was speaking to this source. And they used police work to corroborate the facts they were getting from him, even if those were innocent facts. The biographical information, they had a full name of the defendant. They knew his full identity, and were able to start researching. And they had an address where he lived, which was this 807 White Lock apartment. Officer Williams reached out to Homeland Security investigator Edward Kelly, and started looking at the immigration history of the defendant. That was corroborated. They found this immigration history that involved an overstable visa, and ultimately led to that point. But also, that he had these prior drug convictions. Now, obviously, Officer Williams wasn't involved in those drug convictions, but they existed. And they corroborate the information the informant was giving them. This is a guy who is engaged in drug trafficking. Arrested in 2005 for possession and attempted distribution in New Jersey, ultimately attributed to eviction in 2010 for loitering to obtain or sell CPS. That is a drug conviction. Obviously, there's a gap in time there, but it was corroborative of the confidential informant, and shows his reliability. And then the physical location, this 807 White Lock address. That's important because we know that the defendant ultimately is seen there, and that this is where he lives. And Officer Williams was conducting a drug investigation. He actually listened to the confidential informant make phone calls, albeit they were in Spanish, but he had a translator there to help him. This gives him a way to know that the informant knows what he's talking about, as a basis for his attempts. He has a reason to know that the defendant's engaged in drug trafficking, because he's talking to him. He's calling this phone number, and two separate calls, one on June 27th of 2017, and then again in July. The first call, the defendant is talking about going to New York, and he'll get cocaine, and he'll have that cocaine available if the confidential informant wants it. And then in June, he's again saying that he processes cocaine or drugs on behalf of a source that's in New York. And based on that, they wrote an affidavit to get location data. It was actually not a vehicle tracker in this case, it was location data from the cell phone that was being called by the confidential informant. And that corroborated the confidential informant, because the ping data showed this 807 White Lock address is where this phone call is. Obviously, Officer Williams at that time doesn't know the voice of the defendant, Mr. Gondrez-Medrano, but now he knows the person that's being called lives in the address where this informant says he's going to be. All of those things are corroborative of this reliable informant. Then we get to September 8th of 2017. This is where the officers are actually going to watch with their own eyes, as in the Miller case and as in the Blackwood case, things that the informant says are going to happen, happen. The informant tells them on that particular day at a specific time in the morning, the defendant is going to have heroin that he's going to bring from that apartment out of his house to broker a heroin deal. And so they do essentially what happens in the Blackwood case, this controlled by operation. It's similar to that. They begin first investigating their confidential informant's person. They meet with him in the morning. Search to make sure that he doesn't have, he or she doesn't have drugs on them. They search the car to make sure that there's not drugs brought in the car. And then they watch through surveillance as this car is driven to the right address. And the confidential informant goes into the house, is there for about two to three minutes, as Officer Williams testifies, and walks out just as expected. So this is observations that they're seeing that corroborate the tip that they've gotten from their reliable informant. And based on that, they now have probable cause to know that this drug deal is happening, that this shoebox that's being carried by Mr. Gaccio Medrano is drug evidence. And here it is going into a car, a readily mobile car. They watch him put it in the backseat. So they stop the car. They already have the immigration warrant. This again, when they identify him, corroborates that they've got the right person. And they, Officer Williams testifies, he looks into that backseat window, and he sees the box is still in there. At the same point in time, Officer Kelly is on scene as well, and secures the defendant. And both of them testify, both at the suppression motion and at the trial, that Mr. Gaccio Medrano is becoming agitated, I think they say howling, as this box is being recovered, that they ultimately find contains- So, counsel, if I could ask a question, you just referred to testimony at the trial. It, can testimony at the trial be, you know, considered as to whether, in terms of the district, of the court's decision on the motion to suppress? Well, it can, Your Honor, because the, these are facts that are testified to that the court ultimately had to find. Now, we got more detail- But if they, I mean, it, and maybe, so you're, but the decision had already been made, what's the basis for considering, now, if they're the same facts as kind of, you know, six one hand, half dozen another, so that may not, that may not be an issue. But if they're different facts at trial, are those proper for consideration? Well, here, Your Honor, the standard review is to, to examine the findings, the facts by the judge for clear error, but the legal determination of is there a probable cause, de novo, essentially. And so, these are facts that you can find in the record that, but that added to that probable cause. These are things that Officer Williams saw at that moment that built into the probable cause. It's true that that detail wasn't as clear at the suppression motion as it was later, but it's a fact that existed in the real world that built the probable cause. This is something Officer Williams saw that went into his decision to search that box. And ultimately, there was probable cause because of the totality of circumstances that he's seen. So, he has now reason to know and reason to believe that the car contains this box, which the informant has told them is a drug delivery, and they have now watched the defendant carry the box. So, they know he's possessing, whatever's in this box, and he's a part of this drug transaction that's happening. And so, based on that, they have the right to search him, pursuant to Felton and Schimel, search him and send an arrest, and Gantt, and his wingspan, the area he can reach inside of this car. At the point that they recover that box, he's still next to the car. This is not Gantt. He's not handcuffed to the curb, put in the back of a car, and then they search the car. These things are happening right on top of each other, but the defendant, he was still agitated in his howling and is handcuffed because of that reaction. So, he still has access to this car, and there's still evidence of the crime of possession with intent to distribute in the car, independent of whether there's anything to be gained as far as immigration issues. So, based on that, there's two different accesses of probable cause to this box, specifically, and the court was correct to allow the box into evidence and to not suppress it. So, then the next question and issue for this appeal is, what did the defendant know about what was in that box? And the video from his cell phone, the DHL video, is part of that evidence. It's probative of the key elements of possession with intent to distribute. Not just did he possess the shoebox, but did he knowingly possess it with knowledge of the contraband nature of what was inside the box with the intent to distribute? And this DHL video of him opening a drug package covered from his phone was directly probative of those things. I point in my brief to the Samad case, which is comparable, where a box is delivered to a house, the officers know it contains drugs because it's a controlled delivery, but there's no testimony developed that the defendant opens the box, that the defendant says anything to say he knows what's in the box, and they don't find things in the house that are like contraband evidence that he's engaged in drug trafficking, aside from a football patch. Our case is different. The defendant confesses and gives a lengthy recorded statement about this box and where it came from, and he tells us the relevance of this video. He says, translated, of course, into English, when they ask him, how did this box get to you? Essentially, this is it. This is how it got to me. Let me show you on my phone how it got here. He plays this video for the officers. They then ultimately recover it from his phone when they search the phone with his consent. That tells us that this video of what's happening on the phone is linked to the transaction that's happening on September 8th, and that he knows the nature of drugs, these kind of drugs specifically. He is asked what this is in the video. He says heroin. The box is heroin, and we later know mixed with fentanyl. He knows the specific weight of it, 333 grams. Visible in the video is one of these tools of the trade for drug trafficking, digital scale. That's how, presumably, he knows the weight of the package. This, therefore, shows that he has the knowledge of the contraband nature of what's inside that box. What was the explanation, if any, given to get from 333 to the 792 that you put on at trial? We did not present a theory of how the actual stuff in the DHL package related to the September 8th video. There was testimony that ultimately was developed. He said he actually brought that package of drugs up to New York, that this stuff in the box is a separate drug. That was his testimony at trial. Exactly. We don't know the truth of how that processing happened or if those two things were related. We know that they're related because he said they were related. They are the same nature of substance, and they demonstrate his familiarity with contraband. It illustrates that he knows what's going to be in this box. And it was also, of course, probative because he gave this confession. So this video is corroborating his confession. Here's a real thing that happened that has a date stamp of August 24th in the phone that the jury can look at to see, okay, the things that are said in this confession, they relate to the real world. There's a way to evaluate that. And that corroboration is critical. It also gives them everything that they need to resolve the issues that my friend on the other side raises. There is no confusion of the issues or prejudice that outweighs the probative value of that video. There's no trial within a trial or separate trial. Counsel, I just don't recall this, and maybe you do. Was there a 404B argument made, or was it only 403? No, this was offered as intrinsic evidence of the possession with intent to distribute. So it was offered as relevant and probative of his intent. What I'm asking is, did the defendant object under 404B and say it's not intrinsic, it's other bad acts evidence? No, that was not raised as an argument at all below. So this was offered as linked, substantive, probative evidence, and there was no objection raised that, in fact, it's actually prior bad acts evidence. And I think it's important that all of this stuff came together and was all obtained on September 8th. And that's why there's no confusion and no need for a trial within a trial, because everything that is needed to know about the DHL visit video comes from the defendant's own words. He tells the investigators. And I don't want anything that's not in the record, but did the record reveal the metadata of when the video was taken? There was testimony about the timestamp of the video in the file structure. So it was August 24th of 2017. It didn't go as granular as looking at the metadata to see when it was recorded. That's the only information that's in there. Two weeks before this incident? Correct. So yeah, it's about two weeks before this. And he's the one that brought this video to the officer's attention. It was central to showing his level of knowledge and to sort of discounting the ultimate defense, which was that he was an unwitting courier. That he had no idea what was in that box. He had never looked in the box. No way to know that it had drug evidence. So it was critical to proving that he knew what was in that box. And that's why when he lied about that video and he lied about what he knew about it, it was perjury. And the obstruction enhancement was appropriate. He claimed falsely. Counsel, I want you to finish what you need to say, but I got a question about the enhancement and you only got four minutes. So if you would kind of, I want you to finish your thought and then I'm going to ask you a question about that. But I don't want to prevent you from finishing. Understood, your honor. Understood. He lied and he claimed that this video was only recorded so that he could show it to police because he was angry about getting a box of drugs sent to him unwittingly. And that he was under stress with arrest or fear. And the judge made detailed findings that that was false and it didn't match the video itself. The judge below found that his statements in the video, his demeanor, the calm way he spoke, albeit in the Spanish language, his gesture of giving a thumbs up that he felt success or pleasure in opening this package successfully, that contradicted that testimony. And the reason that testimony was offered was to take away the men's right. Was trying to discount that he had any knowledge of drugs or any intent to distribute them. It was key evidence and material to what was testified to. And just like in the son case, that is the heart of the case. That there wasn't sort of an argument, did he have the box? There was an argument, did he know what was in the box and was he willingly trafficking it? And that video shows us, yes, he was. He lied about why that video was recorded to try to take that element away. To your point, your honor. Ultimately, the court imposed a very reasonable and well 120 month, one month, which was one month greater than the mandatory minimum. But importantly, it was within the guidelines range, both with and without. So my question on that is, do you think the judge made a finding on willfulness? Do you think, you know, the statement the defender did not tell the truth constitutes willfulness? And if it doesn't, do you think that is improper under, I think, what would be plain error? But tell me what's our standard review and how that would, how that would, how we should look at that. Your honor, the standard review here is whether there's clear error. And candidly, we've asked this court to give great deference to the judge's findings because he had a bird's eye view of the credibility of the defendant as testified and the appearance of that video. So he testified that the defendant, testified that he had recorded these things under a particular sort of set of emotions that didn't match the video. And the judge ruled that this was material because it went directly to the knowledge and intent. And of course, this is after a direct examination and then a cross-examination and a redirect examination, but he maintained. Let me stop you. I'm not, maybe, I don't know if I asked a question, Roger. What I'm trying to, my question is, did the judge make a finding on willfulness in your view? Let me just go one at a time. Did you think he made a finding on willfulness? I think he made a finding expressly that he found this to be a false statement that the defendant made. I don't think he said the words that this was a willfully made false statement, but of course he was able to see the defendant testify and make this statement freely. So I think that's implicit to the finding that he makes, which is a false statement was given that doesn't match the videos that I watched, essentially. Was there an objection, and your colleague may want to talk about this in his rebuttal, was there an objection to his lack of finding of willfulness, and if so, would we view a challenge to that under plain error? There was no objection made to any particular finding of willfulness or not. There was sort of a factual argument about whether it was factually true that he showed the video later on to law enforcement, and the judge essentially found that that was not credible because he didn't show it in the interview in time. So there wasn't an objection. Ultimately, there's not a plain error here that needs to be corrected by the court because it was it was a harmless error, and he did not enhance the district court sentence, and the district court made a detailed ruling about the 3553A factors stated that he would give the same sentence 10 years and one month with or without that obstruction. My time is up here. Thank you very much. Mr. Guillaume, you have some rebuttal time. Yes, thank you, your honors. Your honors, listening to my colleagues' statements here, I'm focusing first on the probable cause. I have not heard the probable cause that the government relied on to search Mr. Gondez Medrano. Just caught up on, you brought up a moment ago the fact that there was a tracking warrant. Well, your honor, I would submit to you that the probable cause for the tracking warrant does not carry over for the probable cause to eventually search Mr. Gondez Medrano. That probable cause that for the tracking warrant, which we did not contest, simply was to determine whether Mr. Gondez Medrano was, in fact, a drug dealer because, as this court knows, there are times when an informant without So that's right. You agree that in order to get a tracking warrant, you must have probable cause that he was trafficking drugs. That's what the probable cause for the tracking warrant was, right? Suspicion thereof, your honor. It doesn't necessarily mean that it is true because one would never know. Your position is you can get a tracking warrant without probable cause? I think that the magistrate has to have reliable information, but that reliable information does not necessarily extend indefinitely. And in this instance, the officer had probable cause at the time to get the warrant, but by the time that the search was done, there wasn't enough to, in fact, search Mr. Gondez Medrano, which is, I mean, I'm just speculating here, why they showed up with an immigration warrant while he was arrested. He wasn't arrested for any drug activity. They didn't have anything drug-related to arrest him for. So it's like a backdoor into getting the internet toolbox, your honor. But there's no specific instance of criminal activity that the government has cited. With respect to the argument made with willfulness that the court has just raised, I would submit to the court that I did not make an objection at the time, but I believe a plain error analysis would, in fact, apply in this case with respect to that enhancement, your honors. And also just focusing quickly on the issue, I think, as Richardson kind of touched on it and said it more better than I did, which was the amount of heroin in that video, the 333 to the 792. And the testimony that follows kind of encapsulates our argument with respect to how this was a confusing issue for the jury, because the government took a stand but then backed away from the stand and said, well, you guys can kind of figure it out. And my client actually gave me a very detailed description about the issue in this case. What happened to those drugs was not whether they were drugs. It was what drugs belonged to whom and at what time and what was done with them. So he never denied possessing drugs on multiple occasions. So it wasn't necessarily a 404B argument. It was a 403 argument, your honor, just to clarify. Your honors, I am asking that this court to declare that to rule that the district court abuses discretion by bidding that video of Mr. and Mrs. Pedrano. And I'm also asking the court to rule that this report aired when it enhanced Mr. and Mrs. Pedrano's sentence to a obstruction adjustment enhancement. And your honors, I don't have anything further. If you have any questions for me, I would take them at this time. Thank you very much. Yeah, thank you very much for your arguments here today, Mr. We all might see that you're court appointed and we appreciate your service. We obviously couldn't run court without attorneys like you. So and we would ordinarily come down and shake your hand and tell you what a good job you did. But you just have to take a virtual handshake from us today. We do appreciate your arguments. Thank you very much. Thank you all.
judges: Henry F. Floyd, Julius N. Richardson, A. Marvin Quattlebaum Jr.